Government officials are free to urge people not to support political groups they oppose. What they cannot do is use their regulatory might to add or else to that request. Respondent Vullo did just that. Not content to rely on the force of her ideas, she abused the coercive power of her office. In February 2018, she told Lloyds, the insurance underwriter, that she'd go easy on its unrelated insurance violations if it aided her campaign to weaken the NRA by halting all business with the group. Lloyds agreed. Six weeks later, she issued guidance letters and a press release directing the thousands of banks and insurance companies that she directly oversees to cut off their ties with the NRA, not because of any alleged illegality, but because they promote guns. In the accompanying press release, Vullo's boss and co-defendant, Governor Andrew Cuomo, said he directed Vullo to issue the guidance because doing business with the NRA, quote, sends the wrong message, unquote. Shortly thereafter, Vullo extracted legally binding consent orders from the NRA's three principal insurance providers, barring them from ever providing affinity insurance to the group ever again, no matter how lawfully they do so. These actions worked as multiple financial institutions refused to do business with the NRA, citing Vullo's threats. This was not about enforcing insurance law or mere government speech. It was a campaign by the state's highest political officials to use their power to coerce a boycott of a political advocacy organization because they disagreed with its advocacy. Governor Cuomo essentially conceded as much in two tweets responding to this lawsuit, in which he said, and I quote, the regulations New York put in place are working. We're forcing the NRA into financial jeopardy. We won't stop until we shut them down. It's time to put the gun lobby out of business. Hashtag bankrupt the NRA. At the motion to dismiss stage, the only question is whether these allegations taken as a whole plausibly plead a First Amendment claim. Because Vullo chose coercion over persuasion, they do. I welcome the court's questions. Mr. Cole, what is the speech here, the protected speech that you allege has been suppressed? Promoting guns. Advocating for gun rights. Sending the wrong message. It is precisely the speech of the NRA which caused Vullo and Cuomo to decide to target their partners  So they are seeking to penalize the NRA because of its speech advocating for gun rights. So your argument is that the sanctions on the third party suppress the speech of NRA? Yeah, it doesn't. Your Honor, it doesn't. The court's First Amendment jurisprudence does not require proof of suppression. It requires proof of burden. If Vullo had imposed a one dollar fine on the NRA for promoting guns, it would be unquestionably unconstitutional even though it wouldn't actually suppress their speech. But here we have actually alleged, and this is at the motion to dismiss stage, the allegations are true, that the NRA has cost the NRA millions of dollars as a result of the kinds of coercion that has been put in place here and that the NRA, like any other advocacy group, relies on banks, relies on insurance companies to be able to do their business. And what is their business? Political advocacy. Isn't the issue of coercion different, though, than the First Amendment question? I mean, you are relying on, I think, Bantam Books, is that correct? Yes. As I read that case, there were really two different things going on. There was an unconstitutional prior restraint, and the court recognized that, and there was the implementation of that unconstitutional restraint through the means of government coercion. So if I'm right about that in terms of how we should be thinking about Bantam Books, then don't we have two different questions here, the first being, did Vulo actually coerce any regulated entities to do something vis-à-vis the NRA, and then was that something, a violation of the NRA's First Amendment rights, say, through retaliation or censorship, which are the two First Amendment theories that I pick up from your complaint? Yeah. Justice Jackson, I think what Bantam Books stands for is that government officials are free to encourage people to take down speech or to penalize a group. What they are not free to do is to use coercion to that end. Here, there's no question on this record that they encouraged people to punish the NRA precisely because and only because of its political views. No, I understand that. So the question is, is there coercion? No, no, but they're two different pieces, right? You have to show that there's coercion, and you allege that, but you also have to show that that coercion resulted in a First Amendment violation. Bantam Books is saying you can't do indirectly what you can't do directly, but the direct thing in Bantam Books was a prior restraint. This here doesn't look like a prior restraint. So this is sort of Justice Thomas' question again, right? What is your theory of the First Amendment? Again, it's the same answer as to Justice Thomas. Of course the First Amendment prohibits absolute censorship or suppression of speech, but it also prohibits the imposition of any burden on speech because of its content. Even if the government denies a contract to an entity because it disapproves of what that entity says. Right, but isn't the hard part figuring out whether the burden is being imposed because of the content of the speech or because of the conduct? So that's why we have to be really careful about what you're alleging is the First Amendment problem, because the government can regulate conduct. I agree. And if this was a case in which the government had said, you know, the NRA is violating the law left and right, and we have to respond to that, and here are the legal obligations, that would be one thing. That is not what they said. They said we want to shut the NRA down. We want to put the gun lobby out of business. The title of the guidance letters that she issues are guidance regarding the NRA and other gun promotion organizations. The whole guidance is saying, I don't like the fact that people use guns. I don't like the fact that people advocate for the use of guns. We need to stop this. We need to stop this now. Isn't that her motivation? I mean, I understand. That sounds to me more like a retaliation kind of First Amendment theory, as opposed to something that's happening in bantam books, which is pressure being applied to actual entities that themselves are speech distributors, so that those entities are censoring the speech as, you know, as in their power because they're the kinds of things, they're book distributors, et cetera. These are insurance companies who are being pressured, and so it's at least attenuated in that sense the impact on speech, correct? So if the government were providing insurance, if it had a contract with let's say it provided some sort of insurance to advocacy organizations and said we'll give insurance to some, but we're not going to give it to advocacy organizations that disagree with us and that, for example, promote guns. That would be a clear violation of the First Amendment. It would not be censorship. It would not be suppression. But it would be a penalty imposed because of the viewpoint expressed by the organization. In this case, Maria Vrilo herself and Governor Cuomo made it absolutely clear, both in closed-door meetings with Floyds and in public guidance letters and in tweets about this case, that they were singling out the NRA not for insurance law violations. They were singling out the NRA because it promoted guns, and they were against the promotion of guns. They can advocate against the promotion of guns. They can encourage people not to support groups like the NRA. What they can't do is then invoke the coercive authority of her office. And look at the guidance letters. She could have written an op-ed if she was moved by the problems of gun violence, but she didn't. She invoked her statutory authority, unique statutory authority, to issue guidance letters. What are guidance letters? According to Respondent, they are designed to tell regulated entities their obligations. Then in that guidance letter, what she does is go on for four paragraphs about how bad guns are, and then in the fifth paragraph says, in light of the above, we urge you to reconsider your relations with the NRA and other gun promotion organizations, no evidence that any other gun promotion organizations are involved in any insurance, illegality, or anything, and reconsider your risks and manage those risks. Take prompt action. And then she issues a press release that same day in which she says, cut your ties in order to manage your risks. Can I ask you a question? Are you asking the court to break any new ground in this case? Absolutely not. This is about as square corners a Bantam Books case as you can imagine. How does your understanding of Bantam Books differ, if at all, from Respondent's and from the SG's? So the SG, as you'll note, is essentially on our side in this case, formally in support of neither party, but taking our time because they're supporting a reversal on the merits question. We believe that you do have to demonstrate coercion. You have to demonstrate some coercive threat, some invocation of regulatory adverse action. We have that here. We have it with the insurance law enforcement. We have it with the invocation of reputational risk. Reputational risk. She didn't just say, you know, guns are bad. You should reconsider your relations with the NRA. She said, guns are bad. You should reconsider your relations with the NRA because it's a reputational risk. But that idea of reputational risk, Mr. Cole, that is a real idea, right? It wasn't invented for the NRA. There is a view that bank regulators have that companies are supposed to look at their reputational risks. So how do we know? I mean, there's obviously a lot about guns in that letter, but it might be that gun advocacy groups, gun companies do impose reputational risks of the kind that bank regulators are concerned about. So how do we know? So I don't think you actually have to make that decision, Justice Kagan. The question under ban to books, there's two elements to ban to books. Did the government urge third parties to penalize or suppress speech, one, and two, did they use coercion to effectuate that encouragement? And the invocation of reputational risk is the use of coercion, whether or not it is in fact a reputational risk or not, it is still the use of the coercive authority of the state to encourage these entities to punish the NRA because of its speech, to cut their ties. That's number one. Number two, look at the Lloyds meeting. There's no discussion about reputational risk there. I put the Lloyds meeting in a different category and was really more interested in I think that this is a closer one. Just because if reputational risk is a real thing and if gun companies or gun advocacy groups impose that kind of reputational risk, isn't it a bank regulator's job to point that out? So it may well be, and in ban to books the court says that there's a safe harbor for genuine advice about law enforcement. This was not genuine advice about law enforcement. Why would she spend four paragraphs denouncing guns? That actually has nothing to do with whether there's reputational risk. That has everything to do with what she said in the meeting with Lloyds she was trying to do, to weaken the NRA because she disagreed with its political viewpoint. So yes, reputational risk, if it was employed in a content neutral way to address conduct across the board that raises reputational risk, that's one thing. If you use it, it's a very broad term. If you use it to target a particular political group because you disagree with its point of view and you announce that in the very document in which you're doing it and in the press release in which, again, Andrew Cuomo says, I directed her to issue the guidance because doing business with the NRA sends the wrong message. That does not create reputational risk. That is, it supports an organization that I as governor disagree with. And he can disagree with it. He can urge people not to support it. What he can't do is, again, invoke the coercive power of the state in this way. And whether or not there is a reputational risk or not, I don't think ultimately changes the outcome if you're using coercive authority. Take Bantam Books. Suppose in Bantam Books the commission had, instead of sending the police to visit and say, hey, how's it going, if you take the books down, they said, we're going to send the police to the bookstores that continue to sell these books and look into code violations, building code violations. And they, in fact, found code violations, and they enforced those code violations against those bookstores. That would be illegal activity. The code violations is illegal activity. There's nothing illegitimate about looking into code violations. But if you're doing it to give force, give coercive power to a government effort to encourage a third party to suppress speech, it violates the first amendment. Mr. Colt, speaking of violations, your friends on the other side complained that you haven't made the adequate showing for a retaliation claim. So how do you distinguish between a Bantam Books claim like the one that you're bringing and a retaliation claim under Nieves? And is it just a pleading choice, or do you want to say a little bit more about that? So I don't think the Nieves question is here at all, because this is a question about whether the First Amendment, the scope of the First Amendment, was violated by these actions. Nieves is about, as you know, is about Section 933, whether there's a particular remedy, a particular damages remedy. We have an injunctive relief claim in this case, which continues to be live and which would, I think, appropriately require taking down the guidance letters, which remain on the New York DFS website to this day, warning businesses not to do business with the NRA. So we have an injunctive claim, so that takes it out altogether. So I don't think it's appropriate. But if you're in Nieves' land at all, this is a Lozman case. This is a case, remember Lozman says, where government officials have adopted an official policy of targeting speech on a matter of concern, public concern for retaliation. That's a straightforward retaliation case, Mount Healthy. The requirements in Nieves don't apply. And so I think whether you're in Nieves' land or not, this case would have to go forward. But I don't think it's appropriate. It wasn't discussed below. It wasn't raised in the op. And they waive Nieves. They don't really make a Nieves argument. They waive Nieves' argument. And then finally, I would say this Court, Nieves and Hartman were identified as narrow exceptions to the Mount Healthy rule for particular criminal contexts. This Court has never extended to the administrative law enforcement context that we have here, and I think there would be very serious questions about doing that. And as to Mount Healthy, we've clearly made out a case. All you have to demonstrate is that, as Justice Alito was saying in the former case, that you have identified that they have targeted you for some adverse action and that they did so, the substantial motivating factor was your speech. Well, they've admitted as much in public statements as well as private backdoor meetings. So we clearly meet Mount Healthy, and it would be open to them at trial to say, well, we have some alternative theories. You'll hear my friend advance some various alternative theories. Those are open to them at trial. But this is a motion to dismiss. Justice Thomas, anything further? Justice Alito? On the question of the meaning of coercion, I can think of a spectrum. On one end of the spectrum, a government official says, look, suppress this speech, and if you don't do it, I have legal weapons I can use against you, and I'm going to punish you for using those. That's very clear coercion. At the other end, the government official who has no authority to do anything for any practical purposes to the entity that the government official is speaking to says, you should do this. It would be a good thing to do. You'd be a good citizen if you did it. And in between, there are a lot of different gradations, particularly when the official who's making this request has that power, and you have to assume the person or the entity to whom or to which the request is being made knows that, just as I am sure that these insurance companies were well aware of the power of Ms. Vulo. So how do you define when it goes too far along that line? So I do think that the power of the official over those to whom she is speaking is a relevant factor in the assessment. But the assessment is, at the end of the day, would a reasonable person in this situation feel that the government is coercing it, that it is implying some sort of threat of action against it, of adverse action against it? So the mere fact that someone exercises regulatory power over you I don't think is sufficient. But when combined with what you have here, explicit requests to punish a group because of its advocacy, and the invocation of the very tools she has to make life miserable for them, you're not managing reputational risk. We might fine you, or you've got these technical insurance infractions. We might go after your partners and require them to never provide you affinity insurance ever again. This is on the first end of the spectrum that you identified, Justice Alito. So I agree there are hard cases in the middle, and that's true with any standard that at the end of the day looks at coercion. You know, in the context of confessions, coerced confessions, there are some hard lines to draw. This one is not. Okay. The Solicitor General urges us not to consider the enforcement actions against Lloyds, Lockton, and Chubbs, and the consent decrees, and it argues that the district court held that those actions are entitled to absolute prosecutorial immunity, and Petitioner has not challenged that holding here. Do you want to comment on that? Yes, thank you. Respondent never asserted absolute immunity with respect to the Bantam Books, the First Amendment claims in this case. Absolute immunity was only asserted with respect to a separate selective enforcement claim. They chose, with respect to the First Amendment claims, to only assert qualified immunity. That's number one. So it was not asserted below. It was not asserted in the Court of Appeals. It was not raised in the bio. It's not appropriate for this Court to decide at this stage. Thank you. Justice O'Neill. Tell me how, and I'm going to ask the SG this question, how do we write this case for you? And that would differ from how you think the SG would write it, because Justice Barrett asked you whether you were breaking new ground, and you say, I'm not, but it seems to me you're trying to in the way you're putting this. Well, I'm not. There's a lot about the guidance letters that you agree standing on their own would be okay. I'm still not sure that if the February 18th meeting had not happened, that standing alone, that guidance letter, as written, would necessarily be coercion. And I'm not sure the consent decrees could be viewed as selective prosecution when there is no question, I don't believe, that the carry guard had provisions, carry guard insurance policies, had provisions that violated New York law. They reimbursed for criminal activity, and they reimbursed for intentional acts, which New York insurance law clearly says you can't do. So standing alone, none of these things might be coercive? I see this in light of the February 18th meeting, these things now, which is how the district court wrote it. So how would you write it differently than the district court did, number one? And number two, how would you write it differently than the SG would? I would write it. The Bantam Books holds that when government officials encourage third parties to penalize a speaker because of its views, they cannot use coercion to further that end. Here, respondent used coercion.  The threat, implicit or explicit, and my friend agrees they can be implicit or explicit, of coercive government action, that's coercion. And here, she explicitly threatened that to Lloyd. She said, I'll go easy on you if you cut your ties with the NRA. That's the same as I'll go hard on you if you don't cut your ties with the NRA. And here, she said, I'll go hard on you if you don't cut your ties with the NRA. She invoked her authority to punish organizations and financial institutions with respect to failing to manage reputational risk and made it clear that what she meant by managed reputational risk was cut your ties with the NRA. And then, she very shortly thereafter announced these consent orders with three of the NRA's principal insurance providers, in which she not only punishes them for insurance infractions, but imposes an extraordinary ban, a lifetime ban, in perpetuity. These organizations can never provide affinity insurance to the NRA, even if every T is crossed and every I is dotted under New York law. And with respect to Chubb, one of the three, she got them to agree not to provide insurance to the NRA anywhere in the country, not just in New York. She has no jurisdiction out there. So, I think when you look at those three, I think you under banded books. You have to look at the governance action as a whole. You see that she encouraged third parties, insurance companies and banks. You still haven't told me how you're going to write it. And then, they say with respect to the consent letter, there was absolute immunity, but as I had the discussion with Justice Alito, they didn't assert absolute immunity with respect to the First Amendment claim that comes out of the consent letter. Thank you. Justice Kagan? Justice Gorsuch? We've gone back and forth all morning about the standard. But you've got a First Amendment retaliation claim in this case. And we often look at retaliation in the Title VII context in just the manner you described, the effect it would have on a reasonable person in this circumstance. Do you see any daylight really between those two standards? In terms of defining what constitutes an adverse action? Right. I'm not sure that there is. I don't know that for this case one has to look very hard to see adverse action. When you see a concerted campaign, million-dollar fines, an explicit threat to a major insurance provider, we're going to go hard on you if you don't cut your ties with the NRA. In that context, this is clearly an adverse action under Title VII, under any English-language understanding of adverse action. Retaliation is a familiar concept in a lot of our case laws, all I'm trying to point out. Yes. No, and I think, look, you could look at- And they have gray area cases, all of them. Right. And I think, you know, Bantam Books and retaliation are slightly different, I think, in the way they conceptualize the First Amendment violation. Bantam Books encouraging a third party to punish speech with coercion. Can we look at the Lloyds incident in isolation? I mean, you have a complaint. We're at the motion-to-dismiss stage. We have to take inferences in your favor. And certainly you don't want to be limited on remand to arguing just the Lloyds incident as your case. Well, that's right. I mean, I think right now the most significant harm to the NRA is that the DFS continues to maintain on its Web site these guidance letters, which essentially put a scarlet letter on the NRA with respect to every bank and every insurance company in New York. Those should be taken down. So we would urge you, both for purposes of guidance to others and because it matters to the ultimate remedy in this case, to address the meeting with Lloyds, the guidance letters, and the subsequent enforcement action. The other thing I would say about the meeting with Lloyds is it was in private. It was in private. So the NRA might have suffered some damages vis-à-vis Lloyds with respect to that meeting, but the real damage in terms of putting the scarlet letter on the NRA comes from her public actions and Governor Cuomo's public actions to issue these guidance letters. So I would urge you to address the whole picture here, to reinforce Banden books, and to reverse on the merits. Justice Kavanaugh? Quickly, your view on the four-part test that some of the circuits have developed? You know, I think it's fine. That's about all I need. Yeah. I think it gets— You can explain. I would just say as long as the ultimate inquiry is, has the government engaged in coercion? Has it invoked its coercive authority in some way, shape, or form? And what if New York went to insurance companies and said, we don't want you to continue insuring gun manufacturers or sellers for the same reasons? How does that constitutional analysis work? Well, that wouldn't be a First Amendment problem. Would it be anything? It might be a Second Amendment problem. I don't know, but I'm not sure it would. If the government's coercion is focused on conduct rather than speech, then it's not a First Amendment. And that's my last question. On Banten books, this is a little bit unusual, obviously, because the government's not going to a communications company, a bookstore, or a social media company to, say, take down that speech, but it's going to an insurance company. But I guess I take your point that Banten books, as long as the ultimate action is against speech, it doesn't matter that the intermediary is not itself a speech business. Yeah. I think the key is it's this use of the third party to punish the target. So, for example, in Banten books, if they had said, we're going to encourage those providers of insurance, the bookstores, to stop providing insurance, that wouldn't be a speech intermediary, but it would be the same problem. Thank you. Justice Barrett? I just want to give you a chance, Mr. Cole, to address your friends on the other side's arguments that we shouldn't reach the merits because we lack jurisdiction and because we denied cert on the qualified immunity question. And then they also say that the claim for an injunction is no longer in the case because you didn't cross-appeal it. I just wanted you to give a chance to address that. Yeah, thank you. No, this court did not divest itself of jurisdiction when it granted the case and asked for briefing on only one of the two questions presented. If the court reverses on the First Amendment ground, it would be totally appropriate to send it back to the Second Circuit to reconsider the qualified immunity question, which is, as Respondent herself argued in the Second Circuit, inextricably intertwined with the merits determination. The court's assessment of the merits here is basically disregard of what happened at Lloyd's. It's adopting every inference in favor of VULO and against the NRA with respect to the guidance letters. All of that infected not just the merits determination but the qualified immunity determination. So the court has jurisdiction over the case. It can reverse on the question it took up, and then it can ask the Second Circuit. What about the injunction? And as to the injunction, there was no final order. There's no final judgment, and so we have the right to appeal that, and we will appeal that when there's a final judgment. This was an interlocutory appeal from a qualified immunity holding only, so we have no obligation to cross-appeal. Justice Jackson? So Justice Kavanaugh picked up on what I think might be a critical distinction, and I'm just trying to understand it. So he said, here we have a situation in which the government is not acting on a company that is itself in the business of speech, which is true, unlike Bantam Books where it was. And so what I'm worried about is your position ultimately reducing to any time a regulator enforces the law against an entity that does business with an advocacy organization. We have a First Amendment violation. Because it seemed like your answer to him was, well, what gets this into the First Amendment column, unlike other scenarios, is that the NRA advocates for guns, and it's an advocacy organization. And so action taken against it makes it a First Amendment violation, even though the government was not coercing the speech itself in the same way as Bantam Books. So how do we avoid a world in which advocacy organizations are exempt from regulation? So we're definitely not asking for an advocacy organization exemption from regulation, or even from regulation of third parties. What Bantam Books requires is that the government encourage third parties to punish speech. Once they've done that, it's not punishing speech. It is censoring speech. No, it's true. In Bantam Books, it was about censoring speech. But again, as I have said. But why isn't that relevant? I mean, Justice Gorsuch suggests that you might have a retaliation claim, which is a kind of First Amendment. It's a species of First Amendment. You allege it in this case. And that makes perfect sense, right? So they're punishing me because of my speech. That's retaliation. Censorship is something different. And what I'm suggesting is that Bantam Books is basically a censorship case. That what they're doing is forcing these companies to take down or remove speech that the government objects to. And that I don't quite see happening here. As opposed to the other theory that you do allege, which is they don't like what it is that we do. And they're using the levers of government to prevent us from operating. And if there were a distinction in the First Amendment between censorship and burdening speech because of its content, then maybe that would be correct. But there is no such distinction. The First Amendment requires strict scrutiny when the government censors speech because it doesn't like its content, when it burdens speech because it doesn't like its content. And in this case, it sought to burden rather than censor. But that doesn't in any way alter the logic of Bantam Books, the way Bantam Books has been applied for 60 years. It has been applied consistently to situations in which government officials. I've never seen any other situation like this. All of the other Bantam Books situations are censorship situations. No, I don't think so. With all due respect, Backpage is the Seventh Circuit decision by Judge Posner is very similar. It was a sheriff who didn't like what a particular social media platform was doing. And what he did was he encouraged credit card companies not to do business with that platform. And he did it through coercive means. Thank you, Counsel. Mr. McNeil. Thank you, Mr. Chief Justice, and may it please the Court. Government officials may criticize private speech that they deem harmful and persuade citizens not to support that speech. But government officials may not threaten to take adverse action against private parties to coerce those parties into penalizing a disfavored speaker. Taking petitioners' allegations as true, that is what Respondent did here. In the Lloyds meeting, she explicitly threatened to bring an enforcement action against Lloyds unless Lloyds, quote, ceased providing insurance to gun groups, especially the NRA, close quote. The Court should find a straightforward First Amendment violation under Bantam Books, but in recognizing the First Amendment claim here, the Court should take care to avoid suggesting any new limits on the government's ability to speak to the public or its ability to provide ordinary legal guidance to regulated entities. I welcome the Court's questions. Could the government, rather than coerce a third party, simply entice them to reach the same suppression, do the exact same thing and suppress speech? Well, it depends, Justice Thomas, what you mean by entice. If it doesn't rise to the level of significant encouragement under — What's the difference? Well, Bloom requires that significant encouragement essentially overwhelm the judgment of the independent intermediary, whereas — And what would that look like in this case? In this case, I mean, I think you could kind of — I think you could think of the offer of leniency that Vullo made to Lloyds as either a form of significant encouragement, that she's saying we will go easy on you for some legal violations, or as a threat, basically saying we will bring these enforcement actions against you if you do not stop doing business with gun groups. So coercion and significant encouragement are two sides of the same coin, as Mr. Fletcher said earlier. Counsel, consider overlap, obviously, with the first case. Could you articulate what the significant differences are between your position in this case and the office's position in the prior case? There are no differences as to legal principles. The difference here is that there is a specific coercive threat, particularly in the Lloyds meeting, where she threatened adverse action in the form of enforcement action so that Lloyds would comply with a specific instruction to cut ties with all gun groups, especially the NRA, whereas in Murphy, the plaintiffs did not identify any instance in which a government official threatened to take adverse action against a social media company to get the social media company to engage in specific content moderation. They just point to generic references to legislative reforms that were untethered from any content moderation request. So are you focusing on the specificity of the government action, or what? In Murphy, there was no threat at all. There was no threat of adverse action at all. There were just talks about legislative reforms, but they were not connected to any specific instructions. So coercion, in our view, requires a threat of adverse action connected to a specific instruction, such that it's saying, if you don't do X, we will do Y to you. And that was not in the record in Murphy. It is in the record, according to the complaint here, with respect to the Lloyds meeting in particular. And does that mean that, really, the New York officials could have achieved what they wanted to achieve if they hadn't done it in such a ham-handed manner? So instead of having the meeting with Lloyds, they just gave speeches about guns and how bad the NRA is, and they spoke about social backlash against guns and those who advocate for gun rights in the wake of the terrible Parkland shooting. But in all of that, they don't mention anything about any regulatory authority. And then, after harping on that for a while, then they make general statements about the importance of every insurance company taking into account reputational risk. And then they sit back and they see whether that's achieved the desired result. Basically, that's what your position is, isn't it? No, Your Honor. If what they did was what I just outlined, would that be a violation of Bantam Books? Probably not, because there would be an attenuation between the invocation of legal consequences and the instruction or the message. But we think the first four paragraphs of the guidance letters standing alone are permissible government speech because those four paragraphs involve criticisms of the NRA and urging third parties not to support the NRA. That's the classic form of government speech that falls within long-standing tradition. President Reagan expressly criticized the KKK and urged citizens not to support or associate with the KKK. That's what the first four paragraphs are doing. Well, and if they had said everything in those first four paragraphs in some other format, it would be a different matter. But this is a guidance letter. I take the point that the fact that it's in a guidance letter is highly unusual. You would expect to see this in an op-ed or a press conference. And that is a factor, I think, in going to the implicit coercive analysis. But without the fifth paragraph, there's no invocation of an adverse action at all. So the first four paragraphs standing alone, although unusual, would still be permissible government speech. Yeah, so they gilded the lily or whatever the phrase is. I mean, they were ham-handed about this. The people up in New York are rubes. They don't really understand how to do this. If you do it in a more sophisticated manner, you can achieve what you want to achieve. I don't know, Justice Alito, because I don't know that insurance companies and banks would feel that their will was overborne or that they were really at risk of experiencing adverse action, and you're hypothetical. That's the question. Are the parties able to exercise their own independent judgment? I mean, seriously, you think that sophisticated insurance companies are not taking into account adverse risks? They probably had heard about the Parkland shooting and the aftermath of it. You think they hadn't already taken this into account? And didn't they already know all the power that Ms. Volo had over them? They certainly knew about the authority that DFS had, but without any invocation of that authority and a tying of that authority to a specific instruction, like we have in the guidance letters, I don't think we would get to coercion. Do you agree, though, the fifth paragraph changes the calculus? Yes, Your Honor, but I want to say something to make it very clear. We think that this has to be considered alongside the press release and the tweet. We think that's one unit of governmental communication, so we would not look at the guidance letters alone, and we would look at the guidance letters particularly as a way to reinforce the allegations about the Lloyds meeting rather than considering the guidance letters as a standalone matter. And why are you so concerned? Sorry, go ahead. Just to finish up, do you view this, as Justice Barrett asked, as a clear-cut case under existing law? Yes, Your Honor, especially with the Lloyds meeting, absolutely. Why are you so concerned about only looking at the guidance letters in combination with everything else? What would be wrong with looking at the guidance letters alone, given that there is this fifth paragraph? The fifth paragraph, I think, takes you pretty far, and we're not saying that it would be impossible to conclude that that would be a threat alone, but this was one unit of government communication because it was in the same 24-hour period and they were all discussing the same thing. And I think the press release is measurably more explicit. It says, it, quote, urges businesses to join the companies that have already discontinued their arrangements with the NRA and to take prompt actions to manage their risks. So it's pointing back to the risk management obligations from the guidance letter and it's putting it into one sentence to make it very clear. And then the Cuomo tweet says the NRA is an extremist organization and is urging companies to revisit any ties they have to the NRA and consider their reputations. And our broader concern is just that plaintiffs will, if the court were to focus on the guidance letter alone, it could allow plaintiffs to try to cobble together First Amendment claims by pointing to disparate statements of government speech and trying to connect them up to invocations of legal obligations. Obviously, it's easier here because it's in one document, but that's our broader concern. And these are also just very unusual documents, the guidance letters. It's kind of hard to interpret them in isolation because it is very odd to see this sort of government speech in a guidance document. If this case goes back for trial, do you claim that the guidance letters and the enforcement actions would not be relevant and admissible? No, Your Honor. We think the guidance letters would be relevant. As I said, they reinforce the plausibility of the allegations. Okay. What about the consent decrees? What about the enforcement actions and the consent decrees? So the district court did hold that she was entitled for absolute immunity for those. We also think that they were targeting conduct because they appear to have been based on bona fide violations of New York insurance law. So we don't see a free speech concern independently with them. But I do think that the Lloyds consent decree, again, could bear on the plausibility of the allegations with respect to the Lloyds meeting in the following way. There's a term in the Lloyds consent decree that broadly bans Lloyds from doing even lawful business with the NRA. And that sheds light on the plausibility of the allegation that in the meeting, Vulo was trying to coerce Lloyds into stopping even lawful business with gun groups. Has this court ever held that every federal and state officer who is the head of an executive department or the head of an independent regulatory agency with enforcement powers has absolute immunity? No, Your Honor. But the holding of the district court was that she was exercising a prosecutorial function with respect to the enforcement actions. Yeah. Have we ever held that all of those officials have absolute prosecutorial immunity? No, Your Honor. We're not taking a position on the merits of the absolute immunity question, to be clear. Thank you, Counsel. Justice Thomas, anything further? Justice Alito? I already previewed what my question would be. How do you see them writing the opinion, and how do you want it, and tell me what the differences are and why they're important? So our first order of preference is, as I said, to use the guidance letters as a way to reinforce the plausibility of the allegations about the Lloyds meeting and to hinge the First Amendment analysis on the Lloyds meeting because that's an explicit threat. It's just a straightforward way of resolving this case. And as I said, the guidance letters reinforce the plausibility of those allegations because the guidance letters were sent not only to insurance companies but also to banks, and there's no suggestion that the NRA was doing unlawful business with banks. And, of course, the guidance letters also expressly urge insurance companies and banks to cut all ties with the NRA, not just the lawful business. So those aspects of the guidance letters reinforce the allegation that in the Lloyds meeting, she was trying to coerce Lloyds to stop all of its business with gun groups, not just to target unlawful conduct. Justice Kagan? Justice Gorsuch? Justice Barrett? Just one quick clarification. You say the Lloyds meeting is an explicit threat. So, fine. Let's say they state a claim. What's next in terms of proof? Don't they have to show something about her motivation? So, Justice Jackson, that gets to, I think, something Mr. Cole was talking about. There are two kind of aspects of this sort of claim. There's the coercion question, and then there's the First Amendment harm question. Here, the First Amendment harm is based on viewpoint discrimination. So, yes, they would have to show that she was motivated by the targeting of a particular viewpoint, as opposed to the targeting of conduct. We just think that the complaint alleges that that's what her motive was, because on page 223, it says, I think it says it most explicitly, 223 of the petition appendix, she was engaging in this threat in order to get Lloyds to aid DFS's campaign against gun groups. So, there's a focus on the speech aspect of the NRA, as opposed to any conduct that it was engaging in. Thank you. Thank you, Counsel. Mr. Katyal. Thank you, Mr. Chief Justice, and may it please the Court. The key fact in this case is the conceded illegal conduct. As Justice Sotomayor said, the three insurers and the NRA broke the law. They were selling intentional criminal act insurance, and all of the products they offered were unlawful because the NRA refused to get a license. That's why Bantam Books is miles away from this case, and it's why the court below found qualified immunity protects Vulo. In this posture, Iqbal demands courts ask, as between the invidious coercion asserted or the obvious explanation she was enforcing the law, is coercion plausible? When illegal action is present, the plausibility burden is higher. To use Mr. Cole's phrase, the government is more likely responding to conduct than not speech, and four separate doctrines explain why. First, Iqbal held plausibility rules are, quote, especially important in suits where government defendants assert qualified immunity because they must be neither deterred nor distracted from vigorous performance by disruptive discovery. Second, the presumption of regularity is at its height. Third, absolute immunity protects enforcement actions. And fourth, causation is more difficult. That is particularly so after Parkland, which led many businesses that Ms. Vulo has no control over, such as United Airlines and Avis Cars, to sever ties with the NRA. Were this court to accept this thin complaint and the teeth of the conceded illegal conduct, it would empower strike suits to enjoin valid enforcement and open sensitive discovery. That's why the court's traditional test here is right. A government official crosses the line from coercion to persuasion when, one, they are threatening as opposed to encouraging, and, two, there is no objectively reasonable basis for their action. The NRA can't meet that test, and that's why they are seeking to weaponize the First Amendment and exempt themselves from the rules that govern you and me simply because they're a controversial speaker. I welcome the court's questions. Would you spend just a small amount of time explaining why you think the conduct, all of this, is infected by, I guess, the one illegal insurance product involved here? So, Justice Thomas, our position and Ms. Vulo's position throughout has been there's not one illegal insurance product. It's all illegal. And the attachments to the complaint attach the consent orders, which make that clear. The NRA never got a license for all of the affinity products. It's their burden to prove. I know the word lawful insurance product is in the complaint. They never identified it in the complaint. Our red briefs spent, obviously, a huge amount of time on this and called them out. To this day, they haven't explained one lawful product that was ever issued by these three insurers. And that's why we think if you're asking yourself under Iqbal and Twombly, is there an obvious, likely explanation for what's going on? That's what it is. That's why the consent orders read the way they do. Sorry. These affinity programs could have been altered. And these consent decrees and what she was seeking was a ban even of potentially lawful affinity programs. I mean, if they had taken out the intentionality provision or the criminal activity provision and just insured for accidents with guns or things like that, those would have been lawful. So she went further and said, you can't even have – DFS and regulators do that all the time, Justice Sotomayor. So there are two buckets of illegal activity, serious illegal activity, that Ms. Vullo isolated and they're an issue in the consent orders by name. One is the provision of intentional act insurance, sometimes called murder insurance. That violates public policy in New York as almost every state. Second, the fact NRA was doing all of these affinity products without a license. Now, just without a license alone, DFS routinely imposes massive sanctions, including lifetime bans. For example, MetLife, which we cite in our brief, in 2014, they did the same thing, offering unlicensed insurance with a partner, lifetime ban. Lifetime bans are not unusual. They happen all the time in securities regulation. You can have a lifetime ban for a meeting. What normally happens, Justice Sotomayor, in these cases is if the NRA ever decided that they wanted to get a license and offer a lawful plan, they then come back and seek a modification of the consent order. But there's nothing unusual whatsoever about a punishment like this. What is unusual is to allow a strike suit like this. Remember, this case was filed during the investigation in May of 2018 in order to stop it from going forward. The consent order then happened, and so now they're here trying to effectively undo that enforcement action. And the worry here, it's not just about this case. It's about any case, because everyone can stop a plea negotiation or a consent set of negotiations by saying, you're retaliating against me. I mean, if you just think about what Dinesh D'Souza said publicly in his filings or Michael Avenatti about the president, I'm being retaliated against because of me, because of my speech. And that's the danger, and that's why there's always been an objective unreasonability standard. And Mr. Cole says in his brief at page 23, in his reply brief, oh, don't worry, the NRA will never do this. We've only filed one suit on Bantam Books before in our history, and it's this one. That's wrong. In five minutes of re-internet research, we found another case in which the NRA sued San Francisco on exactly that theory. And if you look at his amici briefs, at least 10 of them admit they want to do this to open up lawsuits for when Chick-fil-A isn't being sold in the right place. Mr. Katyal, what do you do about your friend's argument that you waived this, not raising it in the district court or the court of appeals or in the brief in opposition? He has a couple of waiver arguments, which is this, the absolute immunity point. I'm sorry, yes. Yes, so on absolute immunity, I don't think that we waived it. So, you know, first of all, everything I just said before doesn't turn on absolute immunity or not. I'm explaining why this wasn't coercive, what happened in either the Lloyds meeting or the consent orders. Now, we do think there's a separate argument about absolute immunity, and there's good reason to reach it. It was ventilated down below, and I think it's squarely before this court. So here's what the district court said at Petition Appendix 53A. This is its holding. Boulos' decision to enter into the Lockton, Lloyds, and Chubb consent orders and their precise terms are all entitled to absolute immunity because they are prosecutorial actions premised on enforcement decisions intimately associated with the judicial process. Now, it's fair, as he says, we raise that in the selective enforcement claim, but not in the First Amendment one. But there's good reason for that, because at that point in the district court, their First Amendment claims were focused entirely or almost entirely on the letters and the press release. And absolute immunity, we're not claiming, attended to those acts. We're saying it explains what happened in the consent orders and in the 227 Lloyds meeting. Mr. Caccio, it's a bit jarring, I guess, for me that the Solicitor General is on the other side from you in this case, given that the Solicitor General represents the United States and, as we know from the last case, has a very strong interest in not expanding phantom books. So how should we think about that? Yeah, I think I don't want to characterize their motivations or anything. I just think ultimately when they get to what their test is not different than our test. I think we're all basically in agreement that, for example, that the Second Circuit got it right. The Second Circuit's test is government officials cannot use their regulatory powers to coerce individuals or entities into refraining from protected speech. Are you OK with that four-part test? Absolutely, fine with that. I think the difference is that we do have to insist on an objective reasonability when you're dealing with enforcement actions, that second prong that I started with, because otherwise you're opening the door to, as Nieves points out, anyone will be highly incentivized if they're the target of an investigation to say I'm being retaliated against. So you need to show objective unreasonability. And it's here where their claims fall apart. They were doing massively illegal things. New York enforces that all the time. If a complaint pled something like jaywalking and said, look, you're not enforcing it except against us, that states a claim. That's not this complaint. I'm sorry. Mr. Cotsfield, just to follow up on Justice Kavanaugh's original question, it seems like that we're all in agreement that the law here is clearly established under bantam books and it's just a matter of application. Is that right? So I certainly think the law is clearly established in terms of what I read to you at the Second Circuit. The standard. The Second Circuit standard. That's clearly established. Yes. So the concern is without an objective reasonability test, you open the door to people filing strike suits against enforcement actions all the time. Now, I guess they then say, well, okay, it's not the 227 meeting with Lloyds or the consent orders themselves. You've got to read that in light of the guidance letters, the guidance letters. We think absolutely you should look at them all together as a solicitor general says. I think they do say the meeting itself is enough. Yeah. And if that meeting is enough, Justice Kavanaugh, every meeting, every plea negotiation is enough. That's literally what they are. They're done in secret and behind a closed door to use their insidious language. That's the natural give and take. What Vulo said, according to their own allegations, is we've got some goods on you, and we are willing to look past some in order to make a resolution here. Now, it's true that she and Governor Cuomo have said things about the NRA. There's nothing that ties that give and take in the complaint, and certainly not plausibly so, to the feelings about the NRA. And, by the way, the tweets that my friend has been referring to from Governor Cuomo aren't even in the complaint and were issued months after the complaint was even filed. So I think it's very natural that in a 227 meeting about resolving these issues, you're going to say, look, I'm going to look past some issues in order to strike a resolution. That's all that is. Mr. Kuchel, can I just ask you about the standards again? So suppose I agree with you that illegality was sort of at the heart of what was going on here, that all of the products were illegal. Let's just assume that I agree with you for a second on that. Doesn't that go less to coercion than to the next question, which is whether or not that coercion of a third party affected a violation of the First Amendment? I mean, the fact that the business was illegal doesn't necessarily mean that the February meeting wasn't coercive. I think government action in enforcing the law is coercive. So isn't it just that she has a good defense to the argument that there's a problem here under the First Amendment? I agree with almost everything except your last sentence, Justice Jackson, and the same point you made in the first argument. Coercion by itself is not illegal. Government coerces all the time in plea negotiations and bringing criminal charges and the like. What makes it illegal is if you're retaliating against someone's speech. Do you concede that in this case? That if she was coercing them under these circumstances, it was retaliation? No. So we think that it was an exercise of legitimate law enforcement. We think they're absolutely fine to bring a complaint that has some direct evidence that says, oh, no, it's actually this is not a prosecution that would ordinarily be brought. This is rather a selective targeting of me. That's, of course, the summary judgment stage. Right. I mean, that's not it. Well, it could be done to 12 v. 6 as it was here. And indeed, the selective enforcement claim was thrown out. And our point to you is in order for them to state a claim. And Nieve says this, you've got to plead and prove. That's the language, plead and prove. You've said it four times in the decision. And this complaint does not plead and prove that enforcement wouldn't be ordinarily done. What they've said in the complaint is we have some comparators, the Optometrist Association, the New York City Bar offers insurance, and I guess they allege there are technical violations there. None of those folks are doing what the NRA was doing. You're shifting the burden for them. This is a First Amendment case. All they need to do is to show that the desire to suppress speech was a motivating factor. They don't have to prove that the regulatory action would have been taken, even if Ms. Vola didn't have this motivation. So I think, Your Honor, that Nieve directly says no to that. What Nieve says is precisely because allegations against enforcement are so easy to allege and difficult to disprove, and because it bumps up against the presumption of regularity, and because it opens the door to massive discovery into sensitive government files, and because it incentivizes people to make controversial speech and then claim an exemption, no, you insist that this be in the pleading itself. And that's consistent, of course, with, for example, Iqbal and Twombly, which said similar things even outside of the retaliation. Really, suppose the allegation was we had a meeting with Ms. Vola, and she pulled out a pistol and she held it to our heads, and she said, I'm going to blow your brains out unless you stop writing insurance for the NRA. That would not be enough to even allege a Bantam Books violation, because she might have taken that same regulatory action. She might have taken regulatory action for a perfectly legitimate reason. Your Honor, there, the government's conduct would be objectively unreasonable, and it would flunk our test. So we think this is not a hard test. We're not seeking to change the law. We're just pointing out that when you're in a situation like this of conceded illegality, that there is an obvious alternative explanation for what Ms. Vola was doing here, which was enforcing the law. And this is the worst case in order for you to say this should go past 12b-6, because if you allow this case with its conceded illegality to go past 12b-6, then I think any plaintiff will be able to do this. The government... All right. What was the conceded illegality? Yes. So in the complaint, it attaches the three consent orders by the insurers, all of which say we agree we were offering illegal insurance. All right. Those are those three. And what does that have to do with the NRA and cutting ties with it? Because what they said was illegal was the insurance products with the NRA, that the NRA refused to get a license. And so all of the insurance... But what made it illegal for NRA didn't have to? It could offer its products to someone else. Just that's where I'm confused. Yeah, so... It could use a licensed broker to... Well, once the NRA was acting in this way as a bad actor, Ms. Vullo entered into a consent order with them for a broader prophylactic set of sanctions. This goes back to your first question. That happens all the time. And the reason for that... All right. Then stop. And why are the other insurance carriers that have similar policies, the New York State Bar Association and all the other people who have similar policies, why are they different? Because they didn't do what the NRA did here in the three insurers, which was not just act as unlicensed but offer these insurance policies that seriously violate public policy called so-called murder insurance that cover intentional criminal acts. And when you have those two things together, this enforcement action... But I can check the record. OK. So our position here is that the court should absolutely look at both of these, you know, all of the different conduct together. We think any one of them individually doesn't add up to something that's coercive, and together they don't add up to something that's coercive. The other point I'd like to make, and this goes back to Justice Alito, to your points about Iqbal and Twombly, the standard at the pleading stage, I think it's relevant to note that in Twombly itself there were two alternative explanations for what was going on with these big behemoth companies. One was that they were conspiring and illegally agreeing to divvy up the market. The other was that they made individual determinations on their own to do that. And, Mr. Cottrell, you're right. Quick ball. It says you have to look at the whole of the allegations to determine whether it's plausible or not, right? So here, doesn't that mean we have to look at all of the allegations in the complaint? Correct. OK. And when you do that, I think the one we haven't talked about yet is this reputational risk, these industry guidance letters. And we think these industry guidance letters are so far removed from Bantam Books, we'd urge you to look at footnote 5 in Bantam Books and hold them up against the reputational risk letters. So in those letters, they don't say anywhere anything like we're going to sue you or we're going to regulate, unlike what the threat was in Bantam Books at footnote 5, bringing in the attorney general, bringing in the chiefs of police. They don't say that she's even investigating the companies for anything. There's no reference whatsoever to an investigative body. It doesn't even actually say, as the Second Circuit points out, that there is any reputational risk with the banks and insurers maintaining their ties. It says if any reputational risk. And I think the most important point, and, Justice Kagan, this goes to something you said to my friend earlier, is that these letters are, you know, these aren't the only industry letters DFS sends. They send them all the time, and including reputational risk letters. And you have amici after amici before you saying these are milquetoast reputational risk letters. And if you want a good example, take a look at the one they cite in their brief about cryptocurrency at page 23. That says companies have, quote, legally uncertain practices. They make inaccurate or misleading representations and disclosures, and that agencies are evaluating the legal permissibility in compliance with applicable laws and regulations. Of course, if you're going to issue something like that, you're going to have a disclaimer like the one that they point out in their reply brief. This milquetoast industry letter is the opposite. And the concern we have is that if you point to that as part of a bantam books claim, then you're going to disincentivize people to issue reputation risk letters, which are obviously important, as the amici brief say. You're not suggesting, I'm skipping back a few minutes, you're not suggesting that if, for example, after the initial conduct by Ms. Boulot and the reaction of the National Rifle Association, if she instructed her staff to go through these policies and find something that violates some regulation in there, that she could then defend against the basis of terminating all that, the basis of those newly discovered violations. Right, so there it would be objectively unreasonable. That's like going through to try and selectively target one person. Nieves says that's going to be impermissible. The difference, Mr. Chief Justice, with this case is they didn't point to a comparator. What Nieves is asking is, is this an outlier prosecution or not? Their only claim is, as Justice Sotomayor was saying, the Optometrist Association and the like. Those folks were not doing the same thing at all. At most they were offering an unlicensed affinity product. They certainly weren't offering something as dramatically dangerous to public policy as so-called murder insurance. That's why what Ms. Boulot was doing here was absolutely explainable. There's an obvious alternative explanation, to use the twig ball words, and that's why if you let this complaint go forward, you will be then saying to government regulators everywhere that you have to be careful about the speech you say. For example, last week some of you heard the President say, we beat the NRA. We're going to beat the NRA again. You heard in the first argument a discussion about TikTok and a hypothetical in which the government attacks TikTok and criticizes it. All of those statements now will be used as examples in affirmative litigation to issue strike suits to stop enforcement actions by the FTC, by the Justice Department, by states and the like. And Justice Kavanaugh, I'm troubled by the fact the Solicitor General isn't embracing that, but I do think it's important to point out many states are. You have before you a brief by 10 different individuals. I take what the Solicitor General has done is to read Paragraph 5 of the Reputational Risk Letter so broadly that it becomes coercive, and we just don't think that opinion can write, that if you tried to do that, you would be opening the door to something very, very dangerous and destructive down the road, which is this case will be cited. And they've already had a track record of using a bantam book situation to stop other enforcement actions, not just this one. And it's not just the NRA today. It's every regulated party tomorrow from TikTok on. Justice Thomas? Justice Alito? You say in your brief this case is not even close. Do you stand by that? I do. I do. Under the existing law, yes. Thank you. Justice Sotomayor? Excuse me. Justice Gorsuch? Yes. Justice Barrett? Justice Jackson? Thank you, counsel. Rebuttal, Mr. Cole? Yes. So I agree with my friend on one point. This case is not close. With respect to Nieves, he's taking a particular standard that this court adopted in the particular context of retaliatory arrests. Tens of thousands occur every day and adopted a particular rule with respect to 1985, 1983 damage actions. This is a First Amendment question. It's not a 1983 question. It's a First Amendment question that's before you. This is not a retaliatory arrest case. This is a case that arises very rarely. We've looked at Bantham books, and in 60 years there have been about 20 to 40 cases in the courts of appeals over 60 years involving attempts by the government to coerce a third party to punish somebody else's speech. That's very different from the Nieves situation. So that's just not in the law. You would have to change the law substantially to adopt that. Secondly, with respect to the Cuomo tweets, they were issued after the first complaint, but they were issued before the second amended complaint, which is the operative complaint here. And under TELL Labs, they are perfectly appropriate to consider at the motion's fifth stage judicial notice. Nobody disputes that he said exactly what he said. They want them out of the case because they demonstrate the impermissible motive. Caryguard. Caryguard is a red herring here. The Caryguard program was suspended by Lochtans and the NRA in November 2017. Everything else, everything that we're talking about here happened after November 2017. Her meeting with Lloyds. Lloyds did not underwrite Caryguards. And her meeting with Lloyds says, cut your ties with gun groups, especially the NRA, because I'm trying to weaken them. Gun groups don't have Caryguard. Only the NRA did. It wasn't even operative at that point. The guidance letters say nothing about Caryguard. This is not a guidance letter about insurance infractions. This is a guidance letter about the NRA and other gun promotion organizations. The NRA's insurance was not all illegal. No, the NRA didn't have an insurance license in New York because it's not an insurance company. Nor does the ABA. Nor does the American Ophthalmologist Association. But they all have affinity insurance, and it's just run by brokers, as Justice Sotomayor said, in New York. That's perfectly legitimate. There were some infractions in terms of how it was marketed, how the compensation structures, that were actually quite commonplace in the industry. And she enforced them against them and not against others. Finally, the notion that this is business as usual. Business as usual for a government official to speak with a private party and say, we'll go easy on you if you aid my campaign to weaken the NRA. That is not business as usual. That is not an ordinary plea negotiation. Nor is the guidance letter. Thank you, counsel. The case is submitted.